IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONALD N. HASKINS #285369,   *

    Plaintiff,   *

    v.     *   Civil No. TJS 11-cv-2000

CORRECTIONAL OFFICER  *
BRIAN K. HAWK,
         *
    Defendant.
         *

* * * * * * * * * * * * *

## PRETRIAL ORDER

### I.  STATEMENT OF FACTS

**Plaintiff's Facts**:

  This matter arises out of an incident where Mr. Haskins' cell mate had a cell phone and when Correctional Officers came into the cell he attempted to dispose of the cell phone by throwing it out of the cell.  In the process the cell phone struck one of the Correctional Officers in the head.  The phone fell within the reach of Mr. Haskins who, in an ill-advised effort to help his cell mate, threw the cell phone toward another cell. These facts do not appear to be contested.

  Correctional Officers then subdued Mr. Haskins and the cell phone was recovered. Mr. Haskins version of the incident is that the officer who was hit in the head yelled that "was an assault."  The Defendant, Correctional Officer Brian Hawk heard that remark and believed that Mr. Haskins had thrown the cell phone.

Mr. Haskins was taken off the tier by Defendant Hawk and taken into the property room on the lower level.  In the process of taking him into the room, Officer Hawk pushed Mr. Haskins into a door causing him to strike his head and momentarily lose conscientiousness.  Mr. Haskins fell forward and indicated he had no strength and his head pulsed with pain.  Mr. Haskins was \ then pushed into the room and collapsed on the floor.  Officer Hawk "stomped" Mr. Haskins with his foot.  Mr. Haskins was asked to describe what he meant by stomped and he responded "took his foot and kicked me in my head while I am down on the ground."  This occurred two or three times.

Mr. Haskins was then put into a holding cage and told to get naked.  He was told to take his clothes off.  In that room Mr. Haskins testified that Officer Hawk hit him in his mouth with a closed fist and that he had gloves on at that time.  He was then told to put on his clothes as Officer Hawk pushed his body toward a grill in the room and he again struck his head into the grill causing a scrape on his head.

Mr. Haskins suffered facial cuts and laceration to his forehead.  He was seen by a member of the medical staff.  After the incident Mr. Haskins developed headaches and was seen by a member of the medical staff but no treatment was rendered.

The headaches continued and three days later Mr. Haskins passed out while attempting to urinate.   When assistance came his face was drooping and his whole left drooped and he couldn't speak.  He was placed in a wheel chair and said his leg was dragging as they pushed him.  He was again seen by medical staff and diagnosed as suffering from a stroke.

Mr. Haskins now suffers left side weakness and is currently restricted to a wheel chair.  Steven Levine, M.D., a neurologist has reviewed Mr. Haskins medical records and rendered an opinion that the stroke was caused by the trauma to his head.

Defendant's doctor does not refute the opinion rendered by Dr. Levine.  Defense expert implicitly opines that if Mr. Haskins did not sustain a head injury then his condition is not related to the instant incident.

Brian Hawk was subsequently terminated from employment by the Department of Corrections and charged with bringing contraband into the institution for inmates use.  He was charged with the offense and subsequently convicted but not incarcerated.

**<u>Defendant's Facts</u>**:

On August 9, 2008, at 12:26 p.m., Plaintiff Ronald N. Haskins "Haskins") was an administrative segregation inmate at Western Correctional Institution ("WCI").   His cellmate was Tamall Carroll ("Carroll").  Haskins was keeping watch while Carroll made a call on a contraband cell phone that had been smuggled into their cell.  From his cell door window, Haskins saw two correctional officers moving stealthily toward the cell.  The cell door popped open, and Haskins warned Carroll, hoping that Carroll would flush the cell phone and its charger.   When Correctional Officer ("CO") Michael Gilman entered the cell, Carroll threw the phone out onto the prison tier.  Carroll's hand struck Gilman's forehead, and Gilman sustained a minor scrape but was otherwise uninjured.  Haskins ran out of the cell after the phone, which was lying on the tier.  Haskins dived onto the concrete tier floor, and claims he pushed the phone under the door of another cell, where it was later recovered.  CO Gilman and Sergeant Shawn Shumaker ("Sgt,

3

Shumaker") agree that Haskins dived onto the floor, and jumped onto Haskins' back forcefully as part of a security measure.  Haskins' arms were brought form under his body and placed in handcuffs behind his back; the cell phone was recovered from under Haskins' body.  Haskins was escorted off the tier and down a set of steps by Sergeant Christopher Bingaman ("Sgt. Bingaman").  The entire incident took approximately two minutes.  Plaintiff has not alleged in his Second Amended Complaint that CO's Gilman and Shumaker used excessive force or otherwise violated his federal or state constitutional rights by jumping on his back, holding him down to the concrete tier, or wrestling with him for control of the phone.

Sgt. Bingaman took plaintiff directly to the property room for a strip search.  Strip searches are conducted when inmates have had access to contraband, such as a cell phone.  Haskins was placed into a strip search cage, where he followed Sgt. Bingaman's instructions to remove his clothing, and pass same through an open slot in the cage.  The clothing was then handed to Defendant Brian Hawk ("Hawk"), who was a WCI correctional officer assigned to work the property room on that shift.  Hawk's job was to go through the clothing and look for contraband.  The strip search was conducted quickly and uneventfully.  Haskins was then given an orange jumpsuit to wear, and was taken from the property room to the lobby of his housing unit.  There, he was photographed by CO Brook Braillier ("CO Braillier").  The photographs documented very minor injuries: a minor abrasion to the left upper arm and a minor abrasion to the right knee, along with a very small scrape above Haskins' left upper eye.  Immediately after being photographed, Haskins was seen by Dennis Martin, R.N., (Nurse Martin), who is

4

employed by the Division of Correction's medical contractor.   Haskins was seen by Nurse Martin in his housing unit's medical room.   At 12:56 p.m., Nurse Martin documented the minor injuries in the medical record and assessed plaintiff's condition as an "alteration in comfort, with no treatment needed at this time as abrasions were very minor."  Haskins never complained to Nurse Martin about the brutal beating he alleges he received at the hands of Hawk.

Sgt. Bingaman maintained control of Haskins form the time he was handcuffed and brought to his feet on the tier through the end of his medical visit with Nurse Martin.  Sgt. Bingaman wrote a report documenting his custody of Haskins in connection with the Use of Force Report that must be prepared any time force is used against an inmate, such as the struggle for the phone on the tier floor.  Sgt. Bingaman will testify that Hawk had no physical access to Haskins while Haskins was under Bingaman's control.  Bingaman will also testify that neither Hawk, nor any other correctional officer, committed malicious acts of violence against Haskins in Bingaman's presence, and that Haskins never lost consciousness or suffered any injuries beyond the scrapes noted in the medical record and documented in the photographs.

Haskins and Carroll were split up and placed in separate cells.  Haskins was escorted to his cell by Sgt. Shumaker.  Haskins was administratively charged with possession of a cell phone arising from the incident and was found guilty of violating rules 122 (possession of a telecommunications device) and 312 (resisting or interfering with the performance of staff duties).

Thereafter, Haskins made and signed a brief written statement:

> I [,] Ronald N. Haskins was involve[d] in a situation which W.C.I. officers was aware of, and during the process I was assaulted by several officers. W.C.I. officers was aware of, and during the process I was assaulted by several officers. W.C.I. officers know I don't have nothing (sic) to do with the inc[i]dent. As of now, I still need medical help. I'm asking for a full investigation, please.

Plaintiff has never told a single health care provider that he suffered a brutal beating at the hands of Hawk, or that he sustained a head injury on August 9, 2008, although he had exhaustive and rigorous contact with multiple health care providers beginning on August 9th. On August 12, 2008, plaintiff wrote and signed a sick slip, requesting to see a health care provider for asthma. There was no mention of head injury, loss of consciousness, or any other injury stemming from the alleged beating at the hands of Hawk, and no evidence of injury noted in his medical record after he was seen.

On August 13, 2008, plaintiff began experiencing left-sided weakness. He was held in the WCI infirmary for 24 hours, during which time he was examined by Colin Ottey M.D. and assessed by two nurses. Plaintiff denied recent head injury to Dr. Ottey and the nurses and the medical practitioners failed to not note physical evidence of head or other injury. On August 14, 2008, plaintiff was taken to Western Maryland Health System Hospital for evaluation of his left-sided weakness. In the emergency room, plaintiff denied recent head injury to Jerry Adams, M.D., although he admitted to having experienced headaches for approximately two weeks to a month prior to his hospital admission. Dr. Adams noted no skin or head trauma. That same day, plaintiff was examined by neurologist Riaz Janjua, M.D. Dr. Janjua noted that plaintiff said that he had suffered from migraine-like headaches on the right side of his head for one week, and

denied any recent fall or head injury.  Also on August 14, 2008, plaintiff told Olaide

Ajayi, M.D., a hospitalist, that he had 'bumped his head on a wall' and experienced

headaches to his right forehead since that date.  The medical record noted that plaintiff

suffered "no obvious bruise," and the plaintiff's head/ears/eyes/nose/throat examination

was "normocephalic" and "atraumatic."

Plaintiff's treating physicians at the hospital concluded that he had suffered a

"basal ganglia infarct," or stroke on the right side of his brain, which caused his left-sided

weakness.  Plaintiff now has a condition known as "drop foot," and walks with a four-

prong cane or uses a wheelchair.  Plaintiff will be a Division of Correction inmate until

2032, and will receive medical treatment and medical equipment at no charge to him.

Plaintiff's expert, Steven R. Levine, M.D. has concluded that the alleged head

trauma of plaintiff was a "significant contributing factor/cause of his stroke."  However,

Dr. Levine did find it unusual that there were no signs of head injury in plaintiff's

medical record, and also concluded that he could not rule out that plaintiff received an

injury when he dived onto the concrete tier to recover the phone, and was jumped on by

two correctional officers.  Defendant's expert, Joel Bowers, M.D., a neuroradiologist,

independently read and interpreted the studies performed on plaintiff, and concluded that

plaintiff suffered from an intracerebral hematoma, rather than a stroke.  Unlike stroke,

hematomas are capable of temporal classification.  Dr. Bowers describes plaintiff's

hematoma as acute (6 hours to 3 days old) on August 15, 2008, and sub-acute (3-7 days

old) on August 18, 2008.  Accordingly, the earliest date at which plaintiff's hematoma

could have arisen is on August 12, 2008, three days after the alleged beating.

Plaintiff has the burden of proof in this case.  He has given so many different accounts of what did or did not happen to him on August 9, 2008, that it is difficult to keep score. Plaintiff filed and signed written administrative complaints, sick slips, testified under oath before the Office of Administrative Hearings, and sat for his deposition in 2013.  All of his versions contain both major and minor factual conflicts.   Perhaps more significantly, plaintiff repeatedly failed to claim or describe the alleged brutal beating or head injury to each and every health care provider that assessed, evaluated, diagnosed or treated him, both within and outside the walls of his correctional institution.  Plaintiff's credibility is subject to attack on all of these fronts.  Additionally, a brutal beating such as that described by plaintiff would leave visible injuries.   There were none.   In his deposition, plaintiff agrees that other than his minor scrapes that were photographed on the date in question, he suffered no cuts, bruises, swelling, redness or tenderness in his head or neck region.  Finally, according to Dr. Bowers, plaintiff's intracerebral hematoma did not arise until at least three days after he suffered the alleged brutal beating.  Plaintiff cannot sustain his burden of proof under the Eighth Amendment or Article 25 of the Maryland Declaration of Rights that he was subject to excessive force and malicious conduct at the hands of defendant Hawk.

## II.    COUNTERCLAIM, CROSS-CLAIM, THIRD PARTY CLAIM

None.

## III.    AMENDMENTS OF THE PLEADINGS

None.

## IV.   ISSUES IN THE PLEADINGS THAT WERE ABANDONED

Plaintiff has abandoned his "official capacity" claims against defendant Hawk, and his Article 16 claim under the Maryland Declaration of Rights.

## V.   STIPULATIONS

The parties stipulate to the authenticity of the exhibits listed in VII below.

## VI.   Details of damages claimed or other relief sought by plaintiff as of the date of the pretrial conference:

**Damages:** Plaintiff's non-economic damages include his permanent injury, consisting of partial paralysis of his left side. Plaintiff also claims the psychological trauma which he experienced and still continues to suffer.

**Compensatory damages for:**

1. Pain and suffering;
2. Emotional distress;
3. Plaintiff's partial paralysis of the left side.

**Punitive Damages.**

## VII.   DOCUMENTS THAT THE PARTIES WISH TO ENTER INTO EVIDENCE

*The parties expect to offer:*

1. All medical records of Plaintiff from his prison medical chart and from all hospitals and health care facilities where Plaintiff was admitted, treated, diagnosed, and evaluated from 2008 to the present.
2. Photographs Dated August 9, 2008, of upper tiers.
3. VHS Tape – HU #5, August 9, 2008.
4. SOAP Note Summary completed by Dennis Martin, R.N., on August 9, 2008 at 12:56 p.m.
5. Correctional Officer Shawn Shumaker – Notice of Inmate Rule Violations and Disciplinary Report.

6. SOAP Note Summary completed by Hetty Trenum, R.N., on August 12, 2008, at 12:48 p.m.
7. SOAP Note Summary completed by Colin Ottey, M.D., on August 13, 2008, at 2:14 p.m.
8. SOAP Note Summary completed by Lori Keister, LPH, on August 13, 2008 at 11:44 p.m.
9. Emergency Room Note by Jerry P. Adams M.D., on August 14, 2008.
10. History and Physical completed by Olaide I. Ajayi M.D., on August 14, 2008.
11. Consultation Note by Riaz A. Janjua M.D., and D. Kim Bittner, CRNP, on August 14, 2008.
12. All photographs taken by Correctional Officer Brooke Braillier on August 9, 2008 of Plaintiff, inmate Tamall Carroll, a recovered silver cellphone, and of the correctional officers who participated, responded to, or witnessed the security incident.
13. All photographs disclosed during the discovery process taken of the WCI Housing Unit 5 after Plaintiff filed suit, including photographs of cell doors, the tier floor, the property room, and the medical room.
14. Videos and screen shots taken from B Tier Housing Unit 5 on August 9, 2008, between 12:00 noon and 12:40 p.m.
15. Plaintiff's testimony before the Office of Administrative Hearings on March 24, 2010.
16. Use of Force Reports written by correctional officers with personal knowledge of the cell phone incident of August 9, 2008.
17. Plaintiff's signed statements – handwritten and typed – made on August 9, 2008.
18. Requests for Administrative Remedies ("ARPs"), appeals to the Commissioner of Correction, and Inmate Grievance, written, signed or otherwise adopted by Plaintiff connected with the alleged incident.

*Plaintiff expects to offer:*

1. DPSCS - Use of Force Procedures Manual.
2. Photographs Showing Screen, DPSCS 859.
3. Post Assignment Worksheet, August 9, 2008.
4. Correctional Officer Brian Hawk Notice of Inmate Rule Violations and Disciplinary Report.
5. Correctional Officer Michael Gilman Notice of Inmate Rule Violations and Disciplinary Report.
6. Correctional Officer Christopher Bingaman Information Report.
7. Sick Call slips written, signed and submitted by Plaintiff from 2008 to the present.
8. Defendant's Answers to Plaintiff's Interrogatories, signed in August, 2013.
9. Certified copy of Brian Hawk's conviction.

*Plaintiff may offer:*

10.    Letter of August 11, 2008, from Cotina Haskins and Wendy Trusty to the Secretary of the Department of Public Safety and Correctional Services.
11.    Inmate Tamall Carroll's handwritten and typed statements made on August 9, 2008.
12.    Transfer Summary dictated by D. Kim Bittner, CRNP, on August 20, 2008.
13.    Depositions of Brian Hawk, Christopher Bingaman, Dennis Martin, Michael Gilman.
14.    National Vital Statistics Reports - United States Life Expectancy Tables

### *Defendant Hawk expects to offer:*

1.    Sick slips written, signed and submitted by plaintiff at WCI in 2008.
2.    Plaintiff's Answers to Defendant's Interrogatories, signed in August, 2013.
3.    Plaintiff's deposition of 8/8/13.

### *Defendant Hawk may offer:*

1.    Letter of 8/11/08 from Cotina Haskins and Wendy Trusty to the Secretary of the Department of Public Safety and Correctional Services
2.    Inmate Tamall Carroll's handwritten and typed statements made on 8/9/08.
3.    Transfer Summary dictated by D. Kim Bittner CRNP on 8/20/08.
4.    Depositions of Brian Hawk, Christopher Bingaman, Dennis Martin, Michael Gilman.
5.    True test copy of convictions of Ronald N. Haskins.

## VIII.   WITNESS LIST

### Plaintiff's witnesses:

### *Expected to testify:*

Ronald Haskins #285-369    Jessup Correctional Institution, PO Box 534, Jessup, MD  20794.  No phone.

Brian K. Hawk    123 Humbird Street, Cumberland, MD  21502
240-727-0800

Quinton Davis #283260    Maryland Correctional Training Center, 18800 Roxbury Road, Hagerstown, MD  21746.  No phone.

Tamall Carroll    North Branch Correctional Institution
14100 McMullen Highway SW, Cumberland, MD
21502 – no phone.

| | |
|---|---|
| Hetty Trenum R.N. | Western Correctional Institution, 13800 McMullen Highway SW, Cumberland, MD 21502 301-729-7000. |

**_May testify:_**

| | |
|---|---|
| Cotina Haskins | 1118 Whatcoat Street, Baltimore, MD  21217 |
| Marlow Z. Bates #195027 | Maryland Correctional Institution-Hagerstown, 18601 Roxbury Road, Hagerstown, MD  21746.  No phone. |
| CO Michael Gilman | Western Correctional Institution, 13800 McMullen Highway SW, Cumberland, MD 21502 301-729-7000. |

**Defendant Hawk's witnesses:**

**_Expected to testify:_**

| | |
|---|---|
| Sgt. Christopher Bingaman | Western Correctional Institution, 13800 McMullen Highway SW, Cumberland, MD 21502 301-729-7000 |
| Sgt. Shawn Shumaker | same |
| CO Michael Gilman | same |
| Ms. Brooke Braillier | same |
| CO Patrick Shields | same |
| CO William Gulick | same |
| CO Randy Beal | same |
| Dennis Martin R.N. | same |
| Joel Bowers M.D. | 1618 44th Street NW Washington, D.C.  20007 |

**_May testify:_**

| | |
|---|---|
| Hetty Trenum R.N. | Western Correctional Institution, 13800 McMullen Highway SW, Cumberland, MD 21502 301-729-7000 |

| | |
|---|---|
| Colin Ottey M.D. | same |
| CO Donald Long | same |
| CO Terrell Larue | same |
| Brian K. Hawk | 123 Humbird Street, Cumberland, MD  21502 |
| | 240-727-0800 |
| Karl Jarvis | Jessup Correctional Institution |
| | PO Box 534, Jessup, MD  20794 |
| | 410-799-6100 x1040 |
| Tamall Carroll | North Branch Correctional Institution |
| | 14100 McMullen Highway SW, Cumberland, MD |
| | 21502 – no phone. |

**_Expert witness to testify via de bene esse deposition:_**

| | |
|---|---|
| Joel Bowers M.D. | See address above |
| Neuroradiologist | Deposition scheduled for July 16, 2014 – no pages available yet. |
| Colin Ottey M.D. | Western Correctional Institution, 13800 |
| Internal Medicine | McMullen Highway SW, Cumberland, MD 21502 |
| | 301-729-7000. |

## IX.   LIST OF THE PAGES AND/OR LINES OF ANY PORTION OF A DEPOSITION TO BE OFFERED IN A PARTY'S CASE IN CHIEF OR ANY COUNTER-DESIGNATIONS UNDER FED. R. CIV. P. 32(a) (4).

Plaintiff's _de bene esse_ deposition of Steven R. Levine M.D. is scheduled for July 8, 2014.  No pages available yet.

Defendant's _de bene esse_ deposition of Joel Bowers M.D. is scheduled for July 16, 2014. No pages available yet.

The parties will update this part of the Pretrial Order prior to trial.

## X.   OTHER PRETRIAL RELIEF.

The parties' Motions in Limine, Voir Dire, and Proposed Jury Instructions will be submitted separately.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

/s/
_____
LAURA MULLALLY
Assistant Attorney General
Bar no. 28145
Department of Public Safety and
   Correctional Services
115 Sudbrook Lane, Suite A
Pikesville, MD  21209
410-585-3449

Attorneys for the Defendant

/s/
_____
BERT W. KAPINUS, ESQUIRE
7100 Baltimore Avenue, Suite 102
College Park, MD  20742
301-864-3454

Attorney for the Plaintiff


(signed by Laura Mullally with the permission of Bert W. Kapinus, Esquire)